IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 JUN 22 AM II: 10

... .iSTRICT COURT
N.D. OF ALABAMA

DOROTHY WIGGINS, the administrator )
of the estate of Eric Wiggins, deceased, )
)
    Plaintiffs, )
)
v. )    CV 01-JEO-2894-S
)
CORRECTIONAL MEDICAL SERVICES, )
INC., LAURA KEMP ISBELL, STACI )
MILLER and WILLIAM HAMMACK, M.D., )
)
    Defendants. )

**ENTERED**

**JUN 22 2004**

## MEMORANDUM OPINION

    This matter is before the court on the defendants' motion for summary judgment (doc. 75)

and supplemental motion for summary judgment (doc. 83) as to all the plaintiff's claims in this

action. After consideration of the arguments of counsel, the record, and the applicable law, the

court finds that the motion is due to be granted in part and denied in part as stated below.

### I. BACKGROUND

    The plaintiff, Dorothy Wiggins ("Ms. Wiggins" or "the plaintiff") is the administratrix of

the estate of her deceased son, Eric Wiggins ("Wiggins"). She brings this action on behalf of

Wiggins's estate and against the defendants, Correctional Medical Services, Inc. ("CMS"), Laura

Kemp Isbell ("Kemp"), Staci Miller ("Miller"), and William Hammack, M.D. ("Hammack"), for

causing the wrongful death of her son while he was incarcerated at the St. Clair County

Correctional Facility ("St. Clair") during November 1999. Wiggins was 24 years old when he

died.

    CMS is a corporate entity that contracted with the Alabama Department of Corrections

*90*

("ADOC") to provide health care services to inmates housed in Alabama's prisons, including the St. Clair facility.  According to the plaintiff, Hammack was CMS's medical director at the prison who was responsible for providing medical services to Wiggins while he was incarcerated at St. Clair.  Miller and Kemp were licensed practical nurses ("LPNs") at the St. Clair facility.  They, along with other individuals, were responsible for providing nursing services to the inmates at the prison facility.

In the third amended complaint, the plaintiff asserts that the defendants violated Title 42, United States Code, Section 1983, in that they denied Wiggins medical treatment that resulted in his death, in violation of the Eighth Amendment of the United States Constitution.  (Doc. 82, Count Two).[1]  The plaintiff also asserts state law claims for negligence and wantonness (Count One), and breach of contract (Count Three).  (Doc. 82).  As a part of the negligence and wantonness claim, the plaintiff asserts that the defendants committed medical malpractice (*See* Alabama Medical Liability Act, ALA. CODE § 6-5-480 *et. seq*. and Alabama's "wrongful death" statute, ALA. CODE § 6-5-410) and failed to train and supervise the nurse employees.  (*Id*. at ¶ 27).

## II. STATEMENT OF THE FACTS[2]

### A. Wiggins's Treatment

At all times material to this action, Wiggins was incarcerated at the St. Clair Facility of

---

[1] References herein to "Doc. ___" are to the document numbers assigned by the Clerk of the Court.  They are located in the lower right-hand corner of the document.

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Ins. Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

the ADOC in the segregation unit.  He had been an inmate at St. Clair since 1994.  He was diagnosed at the age of 13 with progressive glomerulonephritis. His condition had been described as end stage renal disease; however, his condition had stabilized and dialysis was not required during the relevant period.

In November 1999, Wiggins was housed in disciplinary segregation as a consequence of his previous conduct.  Wiggins was confined to his cell for approximately 23 hours per day. (Samuel Lane Deposition ("Lane Dep.") at p. 51).[3]

On November 4, 1999, he was seen in the infirmary with complaints that the right side of his body was going numb.  (Medical Records ("MR") at 001).[4]  He was seen by Hammack and a nurse on November 5, 1999.  (MR-004).  He was discharged to segregation with a follow-up appointment on November 9, 1999.

On November 6, 1999, he was taken from segregation to the healthcare unit following complaints that his arm was dead and it hurt all the way to his chest.  (MR-009).  Following an examination by a nurse, he was sent back to the segregation unit and told to keep his November 9, 1999, appointment with Hammack.  (MR-009).

Wiggins was taken from his cell in the segregation unit to the healthcare unit during the morning of November 9, 1999, for his follow-up visit.  He was seen by Hammack who noted that Wiggins complained of elbow tenderness.  (MR at 001).  After questioning whether this was bursitis, Hammack discharged Wiggins back to his segregation cell with instructions to conduct range of motion exercises and a prescription for Motrin.  (MR-003).

---

[3] Lane's deposition is located at document 80, exhibit 13.

[4] The medical records are located at document 80, exhibit 4.

That afternoon, at approximately 3:00 p.m., Wiggins returned to the healthcare unit complaining to Miller of pain in his leg. (MR-007). Miller discharged Wiggins to segregation without conducting an examination of his leg. (MR-007; Staci Miller Deposition ("Miller Dep.") at p. 153).[5]

Wiggins remained in disciplinary segregation from November 9th through November 15th. (MR-009). On November 15, 1999, Wiggins was taken to the healthcare unit at 9:00 a.m. with a complaint of chest pain for the previous three days.[6] He also complained of dizziness, severe burning pain in his chest, and difficulty breathing. (MR-008). The nurse on duty charted that his pulse was 104 and his respiratory rate was 24, which was abnormally high. (MR-008; Mae Pasquet Deposition ("Pasquet Dep.") at p. 57).[7] His oxygen saturation rate was also low with a reading of 86%. (MR-008; David Seignious, M.D., Deposition ("Seignious Dep.") at p. 87).[8]

Hammack evaluated Wiggins between 2:00 p.m. and 5:00 p.m. on November 15, 1999. He charted that Wiggins's oxygen saturation rate was up to 90%. (MR-004, 005). Following his examination, Hammack ordered that Wiggins be admitted to the infirmary, that he be placed on a regular diet, and that his oxygen saturation rate be checked by the nursing staff at each shift change. (MR-003, 005). Despite Dr. Hammack's orders, Wiggins's oxygen saturation rates were not checked again by the nursing staff. (MR-005).

At 2:40 a.m. on November 16, 1999, the nurse on duty found Wiggins on the floor in his

---

[5] Miller's deposition is located at document 80, exhibit 15.

[6] The record also reveals that he complained to at least one other inmate of chest pains and feeling sick during that time. (Lane Dep. at pp. 10-11). However, there is no evidence that these complaints were communicated to the defendants prior to November 15, 1999.

[7] Pasquet's deposition is located at document 80, exhibit 16.

[8] Seignious' deposition is located at document 80, exhibit 18.

cell in the infirmary unable to breathe. (MR-005). An ambulance was called and he was taken to Cooper Green Hospital at 4:29 a.m. He suffered a massive, acute pulmonary embolism and died at the hospital at 6:30 a.m. (Autopsy Report ("AR") at p. 0002;[9] MR-010).

## B. Policies and Procedures

CMS's written policies and procedures require that CMS's nurses conduct daily evaluations of the inmates in disciplinary segregation. (CMS Policies and Procedures ("PPM") at 008).[10] The policies and procedures require that the nurses assess each inmate daily for bruising, trauma or any health complaints. (CMS Policies and Procedures Manual ("PPM) pp. 008-009, Deposition of Larry Linton ("Linton Dep.) at pp. 55-56).[11] Additionally, pursuant to the written "Health Services Agreement" between CMS and the ADOC, the nursing staff is required to render healthcare services to inmates at the prison in accordance with standards established by the National Commission on Correctional Healthcare "Standards for Health Services in Prisons." (Health Services Agreement ("HSA") at p. 005, ¶ 2.7, Linton Dep. at pp. 55-56).[12] The "Standards for the Health Services in Prisons" also required daily evaluations of inmates in disciplinary segregation as follows:

> Written policy and defined procedures require, and actual practice evidences, that when an inmate is placed in *disciplinary segregation*, the health authority or his/her designee is notified immediately. . . . Daily visits to segregation by qualified health care professionals are initiated to determine the individual's continuing health status. The health record review and daily encounters are documented in the inmate's health record.

---

[9] The autopsy report is located at document 80, exhibit 1.

[10] Excerpts from the policy and procedures manual are located at document 80, exhibit 5.

[11] The PPM is located at document 80, exhibit 5. Linton's deposition is located at document 14.

[12] The HSA is located at document 80, exhibit 3.

Discussion

> The intent of this standard is to insure that inmates who are placed in
> disciplinary segregation do not have any medical conditions contr-
> indicating such placement.  Daily evaluations ensure that the inmate's
> health status does not decline while in segregation.  For these reasons, the
> responsible physician should be involved in the development of
> segregation policies and procedures.
>
> Owing to the possibility of injury and depression during
> disciplinary segregation, the daily evaluations should include
> notation of bruises or other trauma markings, comments regarding
> the inmate's attitude and outlook (particularly as they might relate
> to suicidal ideation), and any health complaints.
>
> . . . .

(Standards for the Health Services in Prisons ("Standards") at pp. 50-51, ¶ P-39).[13]

The Standards required Hammack, CMS's medical director, to implement segregation

policies and procedures.  ("Standards for the Health Services in Prisons" at p. 50, ¶ P-39). CMS's

Director of Nursing, Lottie Wiley, was responsible for orientating and teaching the nurses the

applicable policies and procedures, including the policies, procedures and standards governing

the evaluation of inmates in disciplinary segregation.  (Gregory Dep. at pp. 30-31; Wiley Dep. at

pp. 44-45).[14]  CMS's nurses conducted their disciplinary segregation evaluations each night

beginning at 11:00 p.m.  (Wiley Dep. at p. 28).  The inmates were usually asleep at this time.

(Kemp Dep. at p. 33).  Wiley, however, taught the nurses that they only need check each inmate

to see if he was breathing.  (Wiley Dep. at pp. 28-30).  If the inmate was asleep, then Wiley

taught the nurses to simply look to see if the inmate was breathing by watching his chest rise and

---

[13] Excerpts of the Standards are located at document 80, exhibit 6.

[14] Gregory and Wiley's depositions are located at document 80, exhibits 9 and 19, respectively.

fall.  (Wiley Dep. at p. 30).

Kemp's normal practice was to look through each inmate's cell window to see whether the inmate was breathing.  (Kemp Dep. at pp. 27, 42-43).[15]  Nurse Kemp did not look for bruising or trauma, assess the inmate's attitude and outlook, nor did she ask inmates whether they had any health complaints. (Kemp. Dep. at p. 43).  During the three day period preceding the November 15, 1999 complaint of chest pain, the CMS nurses, including Kemp, did not ask Wiggins if he had any health complaints during the daily health assessments. (Kemp Dep. at pp. 27, 42-43, 69).

Following her assessments, Kemp usually completed a "Disciplinary Segregation Medical Documentation" form to record her observations.  (MR-009).  On November 14, 1999, Kemp charted that she checked on Wiggins in his segregation cell and noted that he was "quiet."  (MR-009;  Kemp Dep.  at pp. 68-69).  Kemp did not ask Wiggins if he had any health complaints at that time, but instead observed Eric "breathing" by looking through the window of his cell door. (Kemp Dep. at pp. 68-69).  However, as previously noted, there was no evidence that Wiggins complained to CMS staff during the same period.

Kemp also charted that Wiggins was "quiet" in his segregation cell during her daily assessments on November 15 and 16, 1999.  (MR-009; Kemp Dep. at pp. 69-71).  However, as noted above, Wiggins was not in the segregation unit on November 15, 1999.  He was in the infirmary.  (MR-005, 009).  On November 16, 1999, when Kemp documented that she observed that Wiggins was "quiet" in his cell, he was already dead and was no longer at the prison. (MR-005, 009, 010).

--------

[15] Kemp's deposition is locate at document 80, exhibit 11.

7

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

8

FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## IV. DISCUSSION

The defendants advance numerous challenges to the various claims.  Accordingly, they will be addressed individually with reference to each claim for relief and as to each defendant.

### A. The Pleadings

The defendants' first challenge concerns the sufficiency of the plaintiffs' pleadings.  Specifically, they assert that the plaintiff's pleadings are insufficient to meet Alabama's heightened pleading requirements for medical malpractice claims under ALABAMA CODE § 6-5-551 ("Alabama Medical liability Act").[16]  (Doc. 76 at p. 10).  The plaintiff counters that under FEDERAL RULE OF CIVIL PROCEDURE 8(a), a complaint only need contain  "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a).  In *Caster v. Hennessey*, 781 F. 2d 1569 (11th Cir. 1986), the Eleventh Circuit stated that although state substantiative law applied, the federal procedural law governs the pleading requirements.

---

[16] This section of the Act provides, in pertinent part, as follows:

 . . . . The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts.  The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted.

ALA. CODE § 6-5-551.

9

*Caster*, 781 F. 2d at 1570. *Accord Brown v. Nichols*, 8 F. 3d 770, 773 (11ᵗʰ Cir. 1993) ("The

Supreme Court recently re-emphasized that the Federal Rules 'do not require a claimant to set

out in detail the facts upon which he bases his claim.' *Leatherman v. Tarrant County Narcotics*

*Intelligence & Coordination Unit*, 507 U.S. 163, ----, 113 S. Ct. 1160, 1163, 122 L. Ed. 2d 517

(1993) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957)).") .

Under federal law, "[t]he complaint need only 'give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests.'" *Caster*, 781 F.2d at 1570 (quoting

*Conley v. Gibson,* 355 U.S. 41, 47 (1957)). The court finds that the pleadings in this matter are

sufficient under the applicable standard. The court further finds that under the circumstances, the

allegations also are sufficient under the Alabama Medical Liability Act. ALA. CODE § 6-5-551.

### B. The Lack of Adequate Nursing Care Claims

### 1. Expert Testimony Concerning Proximate Cause

The defendants first substantive challenge is that the plaintiff cannot demonstrate through

required expert testimony of a "similarly situated health provider" that the conduct of Miller on

November 9, 1999, in failing to examine Wiggins's leg was the proximate cause of his death.

(Defendants' Brief at p. 15). The defendants note that the plaintiff's expert, Dr. Gerald Gowitt, a

medical examiner in Dekalb County, Georgia, cannot testify as a similarly situated expert

regarding the alleged deficiencies in the purported conduct of Miller. They rely on the holdings

of the Alabama Supreme Court in *Cain v. Howart*, ___ So. 2d ___, 2003 WL 22160723 (Ala.

2003), and *Lyons v. Walker Regional Medical Center*, 791 So. 2d 937 (Ala. 2000). In pertinent

part these cases provide:

"To maintain a medical-malpractice action, the plaintiff ordinarily must

10

present expert testimony from a 'similarly situated health-care provider' as to (1) 'the appropriate standard of care,' (2) a 'deviation from that standard [of care],' and (3) 'a proximate causal connection between the [defendant's] act or omission constituting the breach and the injury sustained by the plaintiff.'" *Lyons v. Walker Reg'l Med. Ctr.*, 791 So. 2d 937, 942 (Ala. 2000) (bracketed language original).

"[A] medical malpractice plaintiff must produce substantial evidence that 'the alleged negligence "probably caused the [complained of] injury,"' in order to survive a summary judgment motion, if the defendant has made a prima facie showing that no genuine issue of material fact exists as to the issue of causation." *Golden*, 670 So. 2d at 907.

"'To present a jury question, the plaintiff [in a medical-malpractice action] must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have "selective application" to one theory of causation.'"

*Rivard v. University of Alabama Health Servs. Found., P.C.*, 835 So. 2d 987, 988 (Ala. 2002).

*Cain*, 2003 WL 22160723, *8-9.

The plaintiff responds that she is only required to present expert testimony from a similarly situated health care provider as to the appropriate standard of care. In support of this argument, she relies upon ALABAMA CODE § 6-5-548.[17]

---

[17] Alabama Code §6-5-548 provides in pertinent part:

(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.

. . . .

(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a "similarly situated health care provider" as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or

11

The plaintiff has designated Mae Pasquet as a "similarly situated" nurse expert concerning Miller, Kemp and CMS's breach of the appropriate standard of care for similarly situated nurses between November 9, 1999, and November 16, 1999. The court finds that Pasquet does provide sufficient testimony concerning the standard of care to create a fact question for submission of various aspects of the case to the jury on the nursing malpractice claims. The court further finds that the cases cited by the defendants do not require the plaintiff to produce a "similarly situated" expert on the issue of proximate cause. The court cannot find Gowitt's testimony insufficient as a matter of law under the present circumstances.

To the extent that the defendants cite Alabama Code § 6-5-540[18] in support of the argument that Gowitt is not a "similarly situated" expert who meets the requisite standard, the

---

wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty.

ALA. CODE § 6-5-548.

[18] Alabama Code § 6-5-540 provides in pertinent part:

It is hereby declared by the Legislature of the State of Alabama that a crisis threatens the delivery of medical services to the people of Alabama and the health and safety of the citizens of this state are in jeopardy. In accordance with the previous declaration of the legislature contained in Act 513 of the Regular Session of the 1975 Alabama Legislature it is the declared intent of this legislature to insure that quality medical services continue to be available at reasonable costs to the citizens of the State of Alabama. This legislature finds and declares that the increasing threat of legal actions for alleged medical injury causes and contributes to an increase in health care costs and places a heavy burden upon those who can least afford such increases, and that the threat of such actions contributes to expensive medical procedures to be performed by physicians and other health care providers which otherwise would not be considered necessary, and that the spiraling costs and decreasing availability of essential medical services caused by the threat of such litigation constitutes a danger to the health and safety of the citizens of this state, and that this article should be given effect immediately to help control the spiraling cost of health care and to insure its continued availability. Additionally, the legislature finds that the increasing threat of legal actions for alleged medical injury has resulted in a limitation on the number of physicians providing specialized health care in this state. Because of the limited number of insurers offering professional liability coverage and because of the prejudice to the rights of the defendant health care provider through the interjection of evidence of insurance, the legislature finds that the interest of all citizens will best be served by prohibiting the introduction of evidence that a witness testifying at trial is insured by the same insurer as the defendant health care provider.

ALA. CODE § 6-5-540.

court finds that that section of the Alabama Code does not preclude the testimony of Gowitt as a causation expert.  Such an interpretation would be too expansive a reading of that statute.

The plaintiff asserts that Miller breached the standard of care for similarly situated nurses on November 9, 1999, when she "refused to examine Eric's leg that he complained of hurting [sic] at the time." (Doc. 80 at 10 (citing Pasquet Dep. at pp. 46-50)).  She also asserts that Miller breached the standard of care by refusing to come to his aid in the infirmary on November 15, 1999, "when he was pleading for help." (Doc. 80 at 10 (citing Pasquet Dep. at pp. 85-87)).

There is no dispute between the parties that proof of proximate cause must come from a qualified expert. *See Lyons*, 791 So. 2d at 942.  "The reason for the rule that proximate causation must be established through expert testimony is that the issue of proximate causation in a medical-malpractice case is ordinarily beyond 'the ken of average layman.'" *Id.*) (quoting *Golden v. Stein,* 670 So. 2d 904, 907 (Ala. 1995), further quoting Charles W. Gamble, McElroy's Alabama Evidence, § 127.01(5), p. 333 (4th ed. 1991)).  The parties also agree that Alabama law requires that the plaintiff prove through expert testimony "that the alleged negligence 'probably caused the injury.'" *See Lyons*, 791 So. 2d at 942 (quoting *McAfee v. Baptist Med. Ctr.*, 641 So. 2d 265, 267 (Ala. 1994)).

The plaintiff's counsel has designated Gowitt as the causation expert in this case.  Gowitt is a licensed physician in the state of Georgia who is board certified in forensic pathology. (Gowitt Affidavit ("Gowitt Aff.") at pp. 1-2).[19]  Gowitt has reviewed the pertinent medical records of Wiggins. (Gowitt Aff. at p. 2).  Additionally, Gowitt reviewed the autopsy report prepared by Dr. Joseph Embry concerning Wiggins, the forensic science toxicology report, the

---

[19] Gowitt's affidavit is located at document 80, exhibit 7.

13

death certificate, autopsy photographs, histologic tissue sections from Wiggins's lungs, the

pleadings, and depositions of Hammack and Miller. (Gowitt Aff. at p. 2).

The autopsy report lists the cause of death as a massive, acute bilateral pulmonary

thromboembolism. (Autopsy Report at p. AR-002). Due to his education, training and

experience, Gowitt is familiar with the pathology and anatomical processes of pulmonary

thromboemboli. (Gowitt Affidavit at p. 3). He states that pulmonary thromboemboli often

occurs when blood clots in the lower extremities break off and migrate to the lungs. (*Id*. at p. 4

and attachment; Gowitt Dep. at pp. 50-51;[20] Seignious Dep. at pp. 70, 73-74). Based on his

review of pertinent evidence, he determined that Wiggins suffered small pulmonary emboli over

at least the last 10 days before his death. Gowitt further opined that the pulmonary emboli that

Wiggins suffered probably came from his lower extremities due to deep vein thrombosis in his

legs. (Gowitt Dep. at pp. 50-52, 84, 91; Gowitt Affidavit at p. 5 and attachment). This includes

the period during which it is alleged that Miller failed to examine and treat him, particularly on

November 9, 1999.[21] In his deposition, Gowitt articulated his causation testimony stating:

---

[20] Gowitt's deposition is located at document 80, exhibit 8.

[21] Nurse Julie Key who worked in the infirmary on November 9, 1999, testified as follows concerning Wiggins return to the health care unit on November 9, 1999:

Q:    Were you there when Nurse Miller was advised that he was coming back over?

A:    Yes.

Q:    Okay. And, did she have any reaction to the fact he was coming back over to be seen?

A:    Yes.

Q:    What was that reaction? I'm just going to ask you to tell us what your best memory of it was.

A:    That she wasn't going to see that "fucking inmate", that he had been seen, that he had been checked and she wasn't going to check him anymore.

Q:    Her quote was she wasn't going to see - - 'I'm not going to see that fucking inmate'? That's her quote?

14

. . . .

Then at this time the entries in the prison infirmary notes concerning the preceding ten days strongly pointed – you know, that was all there. The preceding ten days of notes were there. To me it strongly pointed to a pulmonary embolism. And, once again, I think he would have lived had the pulmonary embolism – emboli that had occurred and the deep venous thrombosis that was occurring had been diagnosed at that time. Because again, it's my opinion that he did not die until after the episode at 2:40 or so in the morning. I know he didn't die right then. Took a couple of hours to die. But up until that point the treatment for pulmonary embolism and deep venous thrombosis, had it been instituted, more likely than not would have prevented his death.

(Gowitt Dep. at pp. 87-88). In his affidavit, he stated that it was his "opinion to a reasonable

degree of medical probability, based upon [his] education, training, and experience, that had the

episodes of pulmonary thromboemboli been diagnosed any time prior to November 16, 1999,

including November 9, 1999, through November 15, 1999, Eric Wiggins likely would have

survived. The earlier the diagnosis, the more favorable the outcome." (Gowitt Aff. at p. 5).

Because the November 9, 1999, conduct by Miller is so intertwined with the other

conduct in this case, particularly her unwillingness to examine Wiggins's leg, the court finds that

---

A:    That was her word she liked to use a lot.

Q:    Okay. And, was that in reference to Eric Wiggins?

A:    Yes.

Q:    Okay. During that time period between November 4, 1999 and November 15, 1999, when he came in the infirmary with your F-15 there, had you heard Nurse Miller make any other reference to Eric Wiggins, as to the legitimacy of his complaints?

A:    Just that he was lying, there wasn't anything wrong with him.

Q:    You heard her say that about Eric Wiggins?

A:    Yes, I did.

(Key Dep. at pp. 27-28). (Her deposition is located at document 80, exhibit 11.)

The court also notes that one of the plaintiff's experts, Seignious, also stated in his deposition that in his judgment, Wiggins probably had several PE episodes of smaller clots before throwing a larger clot. (Seignious Dep. at 100).

15

the motion for summary judgment as it relates to the issue of proximate cause and Gowitt's

testimony as an expert is due to be denied. The court does not find his status as not being a

"similarly situated expert" sufficient to warrant the granting of the defendants' motion.[22]

### 2. Miller's Conduct on November 15, 1999

The defendants next assert that they are entitled to summary judgment on the claim that

Miller failed to provide Wiggins with medical care despite his "cry for help," because the only

testimony "placing Miller in the infirmary on November 15, 1999, comes from inmate Anthony

Burrell." (Doc. 76 at p. 16). "Burrell testified that Wiggins was beating on the door of the

infirmary asking for help" when Miller allegedly stated, "don't beat on that door unless you are

dying." (*Id.* at pp. 16-17 (citing Burrell Dep. at p. 55)).[23] The defendants also note that Burrell

testified that he saw Miller, another nurse, and an officer go into Wiggins's cell and bring him

out on a stretcher. (*Id.*). They further state that this testimony is obviously incorrect because

Miller got off work at 10:00 p.m., if she was in fact working that day. Apparently, Burrell did

not know Staci Miller and, therefore, was mistaken in his identification of her. They also note

that Burrell admitted in testimony to previously receiving a disciplinary for making a false

statement. (Doc. 76 at p. 17 (citing Burrell Dep. at p. 43)). The plaintiff did not specifically

address this matter in her brief.

It is evident that there is a fundamental factual dispute as to whether Miller was in the

infirmary with Wiggins on the evening of November 15, 1999. It is because of that dispute that

---

[22] To the extent that the defendants assert that Miller's November 9, 1999, conduct is insufficient to support a § 1983 claim, the court finds otherwise as well. There is no question that Wiggins had a serious medical condition, including on November 9, 1999, and that Miller intentionally ignored and disregarded his situation, resulting in significant pain and suffering.

[23] Excerpts of Burrell's deposition are located at document 76 as an attachment.

16

this court cannot grant summary judgment on this aspect of the case.  The undersigned cannot as a matter of law find for the defendants on this issue.  The motion, therefore, is due to be denied as to Miller's alleged conduct on the 15th to the extent that it is advanced in support of the plaintiff's malpractice and § 1983 claims.

### 3. Nurse Kemp's Actions

There are two basic allegations that implicate Kemp in this action.  First, the plaintiff generally alleges that Kemp failed "to follow the applicable national standards and CMS's policies and procedures in conducting daily evaluations of Eric Wiggins while he was held in disciplinary segregation" on November 12-14, 1999.  (Doc. 82 at ¶ 27(h)).  Second, the plaintiff alleges that Kemp "breached the applicable standard of care . . . by failing to accurately chart and document Eric Wiggins's status of November 14, 15, and 16, 1999, when she falsely entered chart notations that Eric Wiggins was 'quiet' in his disciplinary segregation unit on days when he was not in the segregation unit."  (*Id*. at ¶ 27(i)).[24]  It is this conduct that purportedly constitutes a violation of § 1983 and nursing malpractice.

In the summary judgment motion, the defendants argue that there is "no evidence that it was Kemp's duty to care for [Wiggins] in the infirmary.  Therefore, summary judgment as to Laura Kemp is due to be granted on [the] deliberate indifference and medical malpractice [allegations]."  (Doc. 76 at p. 19).  The plaintiff does not specifically address this aspect of the defendants' motion.  The court only agrees, however, with the defendants in part.

_____

[24] In the original complaint (doc. 1), the plaintiff alleged that Kemp failed to provide Wiggins with necessary emergency treatment on November 15 and 16.  Specifically, the plaintiff alleged that "despite Eric Wiggins's cry for help, he did not receive timely or proper care and died as a result thereof.  Defendants RN Staci Miller and LPN Laura Kemp were at the scene, but failed to provide Eric with the basic emergency treatment called for in the circumstances."  (*Id*. at ¶ 28).  These allegations in the complaint have been re-pled in the third amended complaint.

Nothing in the record supports the claim that Kemp was deliberately indifferent to Wiggins's medical needs. The record does demonstrate, however, that Kemp did not follow the national correctional standards and CMS's written policies and procedures requiring that nurses check each segregation inmate for "any health complaints" on a daily basis. The record further shows that on November 14, 1999, she simply looked into Wiggins's segregation cell window to see if he was breathing. (Kemp Dep. at pp. 27, 42-43). She made no inquiry or examination concerning his condition. (*Id*. at p. 43). She simply documented that he was "quiet." The plaintiff's nursing expert, Pasquet, found that the failure to properly assess Wiggins, including on November 14, 1999, fell below the requite standard of care. (Pasquet Report at p. 2).[25]

In view of the foregoing, the defendants' motion is due to be granted to the extent that the plaintiff is alleging that Kemp failed to provide emergency care on the 15th and the 16th because there is no evidence she was responsible at that juncture for his care.[26] If anything, the record demonstrates that she was unaware of his situation because she documented that he was still in the segregation unit when she did her 11:00 p.m. round on November 15, 1999.

The issue is more difficult concerning Kemp's conduct on November 14, 1999, because the evidence is clear that she did not meet the standard of care. However, the evidence regarding causation requires further analysis. Gowitt states that if Wiggins had been diagnosed earlier, his chances of a more favorable outcome would have been greater. (Gowitt Aff. at p. 5). Because Kemp did not examine Wiggins on the night of the 14th, when the evidence shows he was

---

[25] Her report is located at document 80, exhibit 17.

[26] Although the court is troubled by the "false charting" by Kemp, the court cannot find under the circumstances that this alone is sufficient to support the malpractice claim in this instance for her conduct on the 15th and 16th. There is no evidence showing this impacted Wiggins's care or health in any way.

18

suffering chest pain, the court cannot find that Kemp is due summary judgment on this aspect of

the negligence claim. Had she properly examined Wiggins and discovered his current status, the

medical outcome in his situation could have been affected and improved. At a minimum, she

could have alerted Hammack of the situation earlier. Under these circumstances, the court finds

that the defendants' motion for summary judgment is due to be denied as to the negligence claim

concerning Kemp's conduct on the 14th.

### 4. CMS' Responsibility

The defendants state that summary judgment is due to be granted CMS on the nursing

malpractice claim due to the fact that (1) the evidence is insufficient to support a malpractice

claim as to Miller and Kemp, (2) the experts are not able to demonstrate that Miller and Kemp's

conduct was the proximate cause of the death of Wiggins, and (3) absent a finding of malpractice

as to the nurses, there can be no finding of nursing malpractice liability concerning CMS. (Doc.

76 at p. 21).

The defendants' argument would be correct but for the previous conclusions of the court

that the record does not support the granting of the motion for summary judgment as to Miller

and Kemp on at least a portion of the plaintiff's nursing malpractice claims. Thus, the motion for

summary judgment is due to be denied on the nursing medical malpractice claim to the extent it

is advanced by CMS and it relates to the foregoing actions of Miller and Kemp.

### C. The Constitutional Claims Under § 1983

The court has already addressed the constitutional claims against Miller and Kemp. The

unaddressed claims concern Hammack and CMS.

19

### 1. Hammack's Conduct

The plaintiff alleges that Hammack's conduct was constitutionally defective because of his actions on November 15, 1999. Specifically, the plaintiff argues as follows:

> Dr. Hammack was deliberately indifferent to Eric's serious medical needs on November 15, 1999, when he examined Eric in the prison infirmary several hours after Eric presented with severe chest pain, abnormal pulse, abnormal respirations, difficulty breathing and low oxygen saturation measurements. (Medical Records at p. MR-008). According to Dr. Seignious, Dr. Hammack had inadequate equipment and facilities at the infirmary to properly evaluate and diagnose Eric's condition and Dr. Hammack should have referred Eric out to a hospital. (Seignious Dep. at pp. 117-19).

(Doc. 80 at p. 24). According to Seignious, if Hammack had sent Wiggins to an outside facility, the result would have been different.[27] (Seignious Dep. at 116). The plaintiff further argues that Hammack was deliberately indifferent to Wiggins's medical condition because he was pred-disposed to ignoring his true medical needs. (Doc. 80 at p. 25). Specifically, the plaintiff argues that this fact is demonstrated by Hammack's statement in his deposition that if he had sent

---

[27] Dr. Seignious' testified at deposition as follows:

A:   Yes, sir. That on the 15th of November when Dr. Hammack evaluated this individual who was complaining of chest pain, difficulty breathing – and by chest pain, that's chest pain for three days – difficulty breathing, the objective data of elevated respiratory rate, elevated pulse, markedly decreased oxygen saturation, that Dr. Hammack did not refer this man out to a facility where these abnormalities could be evaluated and diagnosed, I believe he fell below the standard of care.

(Seignious Dep. at p. 114)

. . . .

Q:   If Dr. Hammack had sent Eric out on the 15th, in your opinion would the outcome have been any different?

A:   I believe so, yes, sir.

Q:   Based on what?

A:   Based on the fact that he could have gone to a facility – an acute care facility/hospital. The etiology of these – or the cause of these symptoms and signs could have been determined and he could have been treated.

(Seignious Dep. at p. 116)

Wiggins to the emergency room,  they (the emergency room staff) would have laughed at him.[28]
(Doc. 80 at 25 (quoting Hammack Dep at pp. 108-10)).

In response, the defendant's argue that this is insufficient because Seignious testified
during his deposition that he found no fault with Hammack's treatment until the events that
occurred on the afternoon of November 15, 1999.  (Doc. 76 at p. 23).  Specifically, he states that
Hammack's conduct fell below the requisite standard when he failed to order Wiggins's
transportation to another facility where his condition could be diagnosed.  (*Id*. at p. 24 (citing
Seignious Dep. at pp. 112-13)).

At the outset, the court finds it necessary to place Hammack's comment in context.
When he made the comment concerning the emergency room personnel, he was discussing

---

[28] Specifically, Dr. Hammack testified in this regard as follows:

Q:      So there wasn't any reason for concern, in your opinion, based on the history of him having this
        before and no objective findings on this particular day (i.e., November 9, 1999)?

A:      Any time you don't know why people say they have something, it is a concern.  But I am saying I
        don't know what we could have done to had done – to have studied this any further.

Q:      Okay.  Could you have sent him out of the facility to a hospital to have tests done, whether it be
        blood work, respiratory tests, a neurological tests, to see what was wrong with him, could you
        have?

A:      We can at any time.

Q:      You have the authority to do that as the medical director for this facility?

A:      Right.  But when you find no evidence to need to send somebody out, then they would laugh at me
        if I sent them to the emergency room.

Q:      Who would?

A:      The emergency room doctors would.

Q:      They would laugh at a person who comes in with complaints of numbness and nobody knows why
        he is numb in his right side –

A:      No, they would laugh at me.

(Hammack Depo. at pp. 108-110).

Wiggins's presentation of elbow numbness on November 9, 1999.  He was not commenting on the circumstances of November 15 or 16, 1999.

Next, it is imperative to set forth the applicable standard that must be satisfied to demonstrate an Eighth Amendment claim for deliberate indifference.  As already noted, to set forth a cruel and unusual punishment claim concerning the denial of medical care, the plaintiff must show that the defendant acted with deliberate indifference to Wiggins's serious medical needs. *Estell v. Gamble*, 429 U.S. 97, 50 S. Ct. 251 97 L. Ed. 2d 285 (1976).  In *McDuffie v. Hopper*, 982 F. Supp. 817 (M.D. Ala. 1997), the court stated:

> The legal standard at issue is relatively settled.  It is a violation of a prisoner's constitutional rights to be deliberately indifferent to the prisoner's serious medical needs. *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (emphasis added).  Deliberate indifference involves something more than negligence, but something less than a desire to intentionally harm; in effect, an official is deliberately indifferent when he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . [actually] draw[s] th[at] inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994).  Deliberate indifference may be shown when a doctor takes the "easier and less efficacious route in treating an inmate" or when medical care is delayed or denied. *Rogers*, 792 F.2d at 1058.  In addition, medical care that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness violates the eighth amendment."

*McDuffie*, 982 F. Supp. at 825 (footnote omitted).  In discussing Eighth Amendment claims, the Eleventh Circuit has stated that such claims "have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, ----, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992)." *Sims v. Mashburn*, 25 F.3d 980, 983-84 (11th Cir. 1994).  In

*Campbell v. Sikes*, 169 F.3d 1353, 1363-64 (11th Cir. 1999), the Eleventh Circuit stated:

> . . . . in *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d
> 811 (1994), the Supreme Court explained further the requisite "subjective
> component" of a conditions-of-confinement claim and defined the exact
> subjective mental state required for "deliberate indifference," as follows:
>
> > [A] prison official cannot be found liable under the Eighth
> > Amendment for denying an inmate humane conditions of
> > confinement unless the official knows of and disregards an
> > excessive risk to inmate health or safety; the official must both be
> > aware of facts from which the inference could be drawn that a
> > substantial risk of serious harm exists, and he must also draw the
> > inference. This approach comports best with the text of the
> > Amendment as our cases have interpreted it. The Eighth
> > Amendment does not outlaw cruel and unusual "conditions"; it
> > outlaws cruel and unusual "punishments." An act or omission
> > unaccompanied by knowledge of a significant risk of harm might
> > well be something society wishes to discourage, and if harm does
> > result society might well wish to assure compensation. The
> > common law reflects such concerns when it imposes tort liability
> > on a purely objective basis. But an official's failure to alleviate a
> > significant risk that he should have perceived but did not, while no
> > cause for commendation, cannot under our cases be condemned as
> > the infliction of punishment.
>
> *Id.* at 837-38, 114 S. Ct. 1970 (emphasis added) (internal citation omitted). Thus,
> in light of *Farmer*, liability may be imposed for deliberate indifference only if the
> plaintiff proves the defendant actually knew of "an excessive risk to inmate health
> or safety" and disregarded that risk. *Id.* at 837, 114 S. Ct. 1970. Proof that the
> defendant should have perceived the risk, but did not, is insufficient. *Id.* at 838,
> 114 S. Ct. 1970; *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) ("There
> is no liability for 'an official's failure to alleviate a significant risk that he should
> have perceived but did not . . . .'" (quoting *Farmer*, 511 U.S. at 838, 114 S. Ct.
> 1970)). Thus, the official must have a subjectively "'sufficiently culpable state of
> mind.'" *Cottrell*, 85 F.3d at 1491 (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct.
> 1970). This "requirement follows from the principle that 'only the unnecessary
> and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511
> U.S. at 834, 114 S. Ct. 1970 (quoting *Wilson*, 501 U.S. at 297, 111 S. Ct. 2321).

Subsequent to *Campbell*, the Eleventh Circuit further stated as follows:

> Accordingly, under *Estelle* and *Farmer*, deliberate indifference has three

23

components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. Therefore, "summary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: 'since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.'" *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996)). Likewise, in addition to the subjective awareness of the relevant risk, *Estelle* requires that plaintiff show more than mere negligence to establish a violation of the Eighth Amendment and defeat a prison official's motion for summary judgment.

Our cases have given substance to *Estelle's* distinction between "deliberate indifference" and mere negligence, explicating categories of action or inaction that may constitute deliberate indifference. We have repeatedly found that "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) (noting that "knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference"). Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable. *See Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Brown v. Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990). We have also held that deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment. *See Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996); *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel*, 888 F.2d at 789; *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

*McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

Summary judgment must be granted in favor of Hammack unless the plaintiff

demonstrates that he actually knew of an excessive risk to Wiggins health or safety and then

disregarded that risk. *Campbell*, 169 F.3d at 1363-64. The plaintiff argues that the foregoing

24

testimony of Hammack at his deposition shows the requisite culpable state of mind to overcome the defendant's motion for summary judgment.[29]

The court disagrees with the plaintiff's assessment of the constitutional claim against Hammack. The cited evidence is not sufficient to permit this court to allow the Eighth Amendment claim to proceed to trial. Hammack's comment during the deposition simply is insufficient to overcome the motion.[30] The motion, therefore, is due to be granted as to the § 1983 claim against Hammack. The medical malpractice claim is due to be resolved by the jury.

### 2. CMS's Liability Under § 1983

The plaintiff "alleges that CMS was deliberately indifferent toward [Wiggins's] serious medical needs in the implementation of policies that demonstrated a reckless position towards [Wiggins's] medical condition and needs." (Doc. 80 at p. 16). In support of her position, the plaintiff argues, "The existence of general policies or practices can create [ ] constructive knowledge on the part of the supervisor, an acceptance or support of these policies or practices is sufficient to establish proof of acquiescence. . . . The element of causation is established from the fact that the subordinate's action is an implementation of policies accepted by the supervisor." (Doc. 80 at p. 16 (citing *Santiago v. City of Philadelphia*, 435 F. Supp. 136, 152 (E.D. Pa. 1977))).

The defendant argues that CMS is due summary judgment on the § 1983 claim because "there has been nothing but conclusory allegations that CMS 'implemented policies and practices

---

[29] Understandably, there is no dispute that a serious medical condition was implicated in this instance.

[30] To the extent the plaintiff further notes that there is also testimony from the nursing staff that Hammack discouraged transferring inmates to outside facilities "unless they had a medical emergency" (Key Dep. at p. 30), the court cannot find that this practice constitutes deliberate indifference under the circumstances herein.

to curtail the amount of quality medical treatment available to inmates at the St. Clair

Correctional Facility.'  . . . . Neither the plaintiff's complaints nor the plaintiff's experts

articulate with specificity any policies and procedures implemented by CMS that directly caused

the inmate's death." (Doc. 76 at p. 21).

For the plaintiff to overcome the motion for summary judgment, the Eleventh Circuit

requires that she show that "CMS directly caused the violation of [Wiggins's] constitutional

rights through their adoption of some official policy or practice." *Edwards v. Alabama*

*Department of Corrections*, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000). *See also McDuffie*,

982 F. Supp. at 825; *Palermo v. Correctional Medical Services, Inc.*, 148 F. Supp. 2d 1340, 1342

(S.D. Fla. 2001). This requires some affirmative showing on the part of the plaintiff to overcome

the motion for summary judgment.

The plaintiff alleges in her third amended complaint that the defendants inflicted cruel

and unusual punishment on Wiggins by acting with deliberate indifference towards his serious

medical needs, resulting in his death. She alleges that CMS was deliberately indifferent toward

Wiggins's serious medical needs in the implementation of policies that demonstrated a reckless

position towards his medical condition and needs. (Third Amended Complaint at ¶ 49). She

further asserts in her brief, "'The existence of general policies or practices can create a

constructive knowledge on the part of the supervisor, an acceptance or support of these policies

or practices is sufficient to establish proof of acquiescence.' *Santiago v. City of Philadelphia,*

435 F. Supp. 136, 152 (E.D. PA 1977)." (Doc. 80 at p. 16). According to the plaintiff, "[t]he

element of causation is established from the fact that the subordinate's action is an

implementation of policies accepted by the supervisory [sic]." *Id.*

26

The evidence shows that Wiggins became seriously ill and suffered chest pains, a known symptom for pulmonary embolism, while he was held in the disciplinary segregation unit between November 9 and November 15, 1999.  As cited by the plaintiff, "CMS was contractually bound to implement the policies and procedures set forth in the 'Standards for the Health Services in Prisons[,]' to conduct daily evaluations of inmates, including [Wiggins], in disciplinary segregation, and the evaluations were to include notations of . . . any health complaints."  (Doc. 80 at p. 17 (citing *Standards for the Health Services in Prisons,* at pp. 50-51, ¶ P-39; HSA at p. HSA-005, ¶ 2.7; Linton Dep. at pp. 55-56)).  Additionally, CMS's written policies and procedures required that the nurses conduct daily rounds in the disciplinary segregation unit to evaluate prisoners, including prisoners' health complaints.  (Doc. 80 at p. 17 (citing CMS Policies and Procedures, at p. PPM-008)).  However, the evidence before the court shows that the foregoing written policies and procedures were never implemented by CMS and its nursing staff.  Instead, CMS's DON implemented general practices that were inconsistent with the written policies.

Specifically, as correctly pointed out by the plaintiff, "in spite of her knowledge of the standards concerning the protocols for evaluating inmates in disciplinary segregation, and in spite of her knowledge of CMS's written policies and procedures, Wiley, as the DON, instructed nurses conducting daily rounds in the segregation unit to conduct those rounds after 11:00 p.m. when inmates were generally asleep."  (Doc. 80 at p. 17 (citing Wiley Dep. at pp. 20, 22, 27-28, Kemp Dep. at p. 33)).  In conducting their evaluations, Wiley instructed the nurses that their evaluation of sleeping inmates need only include an observation through the window to see whether the inmate's chest was rising and falling to indicate breathing.  (*Id.* (citing Wiley Dep. at

27

p. 30)). Additionally, Wiley did not instruct the nurses to check inmates for bruises or trauma or health complaints on the daily rounds as required by the standards and policies. (*Id*. (citing Wiley Dep. at p. 31)).

The nursing staff at CMS was not made aware of nor trained regarding the protocols for proper evaluations of segregation inmates as required by the "Standards for Health Services in Prisons." (*Id*.). At her deposition, Laura Kemp stated that she had not heard of the Standards for Health Services in Prisons and she was not aware of their application in her work setting. (*Id*. at p. 18 (citing Kemp Dep. at pp. 36-38)). She was further unaware of whether Hammack had put in place or developed a segregation policy and procedure as required. (*Id*. at p. 19 (citing Kemp Dep. at pp. 41-44)). Wiley acknowledged that she and the CMS nursing staff followed an unwritten policy in evaluating disciplinary segregation inmates that differed greatly from the relevant standards as well as the protocols outlined in the CMS's written policies and procedures manual. (*Id*. at p. 20 (citing Wiley Dep. at pp. 27-31)).

CMS may be held liable under section 1983 if the individual making the unconstitutional decision to not follow the policies and procedures had final or ultimate authority to make the relevant decision. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915, 923, 99 L. Ed. 2d 107 (1988) (plurality opinion) (unconstitutional policy can be inferred from a single decision by the highest official responsible for policy in that area); *Jett Dallas Indep. School Dist*., 491 U.S. 701, 109 S. Ct. 2702, 2723, 105 L. Ed. 2d 598 (1989). The relevant question therefore is whether Wiley had final authority for policy in this area at CMS.

The court has examined the relevant contracts that have been provided (the contracts between CMS and Hammack), the excerpts of the depositions, and the arguments of counsel.

28

The court finds that the record fails to demonstrate as a matter of law that Wiley had the requisite final policymaking authority.  In view of the absence of such testimony or other evidence, summary judgment is due to be granted CMS on the deliberate indifference claim.[31]

### D.  CMS Liability on the Medical Malpractice Claim
### Premised on Hammack's Actions

Defendant CMS argues that it is not responsible for the purported negligence of Hammack on the malpractice claim because he was an independent contractor.  (Doc. 76 at 22). Specifically, CMS argues that "[a]t all times when carrying out his clinical duties, Dr. Hammack was acting in the capacity of an independent contractor." (*Id.*).  In support of this proposition, CMS cites *McGinnis v. Jim Walter Homes, Inc.*, 800 So. 2d 140 (Ala. 2001).  The plaintiff responds that CMS is vicariously liable for Hammack's conduct in this matter.  The sum and substance of the plaintiff's argument is that CMS had sufficient control and authority over Hammack's work that it is responsible for his actions.  (Doc. 80 at pp. 31-32).

In *McGinnis v. Jim Walter Homes, Inc.*, 800 So. 2d 140 (Ala. 2001), the Alabama Supreme Court stated:

> . . . . Whether a relationship is one involving an independent contractor or is a master-servant relationship depends on whether the entity for which the work is being performed has reserved the right of control over the means by which the work is done. *Pugh v. Butler Tel. Co.*, 512 So. 2d 1317 (Ala. 1987).  In the absence of a nondelegable duty, the mere retention of the right to supervise or inspect the work of one who would otherwise be an independent contractor, as the work progresses to ensure compliance with the terms of an agreement, does not operate to create a master-servant relationship. *Pugh*, 512 So. 2d 1317.  One must retain control over the manner in which the work is done in order to create a master-servant relationship. *Pugh*, 512 So. 2d 1317.

---

[31] Additionally, the court finds that there is no evidence that Hammack or CMS was aware of the practice that Wiley had implemented.

*McGinnis*, 800 So. 2d at 146. In the medical context, the court described the test as involving the

question of whether the employer "retain[ed] the right to direct the manner in which the business

shall be done, as well as the result to be accomplished, or in other words, not only what shall be

done, but how it shall be done." *Odess v. Taylor*, 282 Ala. 389, 396, 211 So. 2d 805, 811 (Ala.

1968). Specifically, the court noted the following regarding whether a doctor was an employee

in that instance:

> . . . . It would be inconceivable that the practice of a profession with
> delicate and instantaneous decisions to be made, could be otherwise performed.
> The relationship between doctor and patient, or lawyer and client is one of
> personal confidence. The patient or client is not a "customer." He has sought the
> services of his professional adviser because of reliance on the professional
> training, skill, experience, and integrity of his adviser. He does not contemplate
> his professional adviser will act only upon the directions of another.

*Odess*, 282 Ala. at 396, 211 So. 2d at 811-812. This language is instructive in the present

situation.

Under the circumstances, the court finds that the plaintiff has failed to demonstrate that

Hammack is anything other than an independent contractor. To the extent that he was working

under two contracts, the one dealing with his clinical responsibilities demonstrates that he was

acting as an independent contractor regarding the care of Wiggins. The contract states that

"CMS shall not exercise control of any nature, kind or description, relating to the manner or

means in which [he] performs medical services; [he] shall be responsible for his own actions and

decisions." (Doc. 85, Ex. 11 at p. 5). The court does not find the fact that CMS agreed to

provide professional liability insurance for Hammack to be dispositive of this issue. *See Brillant

v. Royal*, 582 So. 2d 512, 516 (Ala. 1991) (evidence that malpractice premiums were paid by

another, among other things, was not sufficient to overcome summary judgment).

The plaintiff also argues that even assuming an independent contractor agreement existed between Dr. Hammack and CMS, CMS asserted sufficient control over Dr. Hammack to create a "agency" relationship. She cites to *Lincoln Log Home Enterprises, Inc., v. Autrey*, 836 So.2d 804 (Ala. 2002) in support of her claim of CMS liability.[32] In *Autrey*, the court stated that an independent contractor may actually be an agent of a principal for purposes of vicarious liability where the principal retains the right of control over the manner in which an independent contractor carries out his work. *Autrey*, 836 So. 2d at 806.

To the extent that the plaintiff argues that CMS is liable for Hammack's action because he was the Medical Director at the St. Clair County prison and CMS asserted control over his duties and responsibilities, the court does not find this argument persuasive. It does not change the fact that the clinical decisions of Hammack are what undergirds the medical malpractice claim in this matter. The fact that he was the Medical Director under the second contract does not warrant a different conclusion under the circumstances. The record does not demonstrate that the diagnostic and treatment decisions he made, particularly on November 9 and 15, 1999, were anything more than his functioning in the clinical setting. There is no evidence the decision making was driven by his duties as the Medical Director.[33] For instance, were the court to conclude that Hammack made the decision premised on financial circumstances, that conclusion would not be supported by any evidence or allowable inference under the circumstances.

Accordingly, CMS's motion for summary judgment regarding the plaintiff's claim that it is vicariously liable for Hammack's acts is due to be granted.

---

[32] The plaintiff also cites to *Spell v. ConAgra, Inc.*, 547 So. 2d 501, 502 (Ala. 1989).

[33] Additionally, the court finds that the plaintiff's reliance on *Spell*, 547 So. 2d 501, is misplaced. It is factually and legally inapposite.

31

### E. Failure to Train and Supervise

In the original complaint, the plaintiff alleged in her third claim that the defendants "failed to train, supervise and instruct subordinates to follow the basic standards of care." (Doc. 1 at ¶ 57). In the third amended complaint, there is no distinct claim premised on a failure to train, supervise or instruct. These allegations are included under the first count which alleges negligence and wantonness. (Doc. 82 at ¶¶ 15-16). They are also included within the § 1983 claim. (*Id.* at ¶ 37). The defendants assert that summary judgment is due to be granted on this aspect of the plaintiff's claims because (1) the general allegations are difficult to comprehend and respond to, (2) Hammack did not supervise the nursing staff, (3) the evidence failed to show that Hammack knew of any deficiency, and (4) the plaintiff fails to offer any evidence of a causal connection between the nurses' actions in breach of CMS policies and Wiggins's death. (Doc. 76 at pp. 30-32).

In response, the plaintiff asserts that the pleadings give CMS fair notice of the plaintiff's claims as is required. She further states that the discovery process also made CMS aware that Wiley was responsible for training and instructed the nurses on how to conduct daily rounds in the segregation unit. (Wiley Dep. at pp. 20, 22, 27-28; Linton Dep. at pp. 78-79). Specifically, the plaintiff states:

> Wiley instructed the nurses to evaluate segregation inmates that are asleep by only observing through the cell door window to see whether the inmate's chest was rising and falling to indicate breathing. (Wiley Depo. at p. 30). Wiley did not instruct nurses to follow the protocol set forth in CMS written policies and procedures and in the "Standards for Health Services in Prisons" to check inmates for bruises, depressed attitude and, most importantly, any health complaints. (Wiley Depo. at pp. 27-31). Therefore, not only did CMS, through its supervisory personnel (i.e. Lottie Wiley), have actual knowledge that its nurse employees were unfamiliar with the appropriate standard of care and protocols in evaluating

disciplinary segregation inmates, it actually acquiesced in such improper training and supervision by its own participation.

(Doc. 80 at p. 27).

The plaintiff's counsel further argues, "In order to meet her burden of proof against CMS on her negligent supervision and training claims, Ms. Wiggins is required to show that the alleged incompetence of the employees was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence. (See *Portera v. Winn Dixie of Montgomery,* 996 F. Supp. 1418, 1438 (M.D. Ala. 1998)." (Doc. 80 at pp. 27-28). In support of this, the plaintiff states as follows:

> Nurse Kemp testified at length regarding her lack of knowledge of both the requirements under "Standards for Health Services and Prisons" and CMS's written policies and procedures concerning the daily evaluation of segregation inmates. (Kemp Depo. at pp. 36-38, 41-44). Nurse Kemp testified that neither Dr. Hammack nor any other supervisory personnel made her aware of CMS's written policies and procedures concerning daily evaluations of inmates in disciplinary segregation. (Kemp Depo. at p. 41). Further, Nurse Kemp testified that she was never made aware that she was supposed to do anything more or that she needed to do anything more than check [to] "make sure each inmate every night was breathing." (Kemp Depo. at pp. 43-44).
>
> Additionally, Nurse Kemp was not the only CMS nurse who was unaware of the standards and policies and procedures regarding segregation evaluations.
> . . . .

(Doc. 80 at p. 28). Key testified that she was not trained in accordance with the policies and procedures discussed above. Key further testified that if an inmate was not on pill call, she did not need to stop and look in the window. Specifically, she stated that if she did, she would "actually get in trouble." (*Id.* at 28 (citing Key Dep. at pp. 38-39)). Kemp and Key also testified at their depositions that they were never provided with a copy of CMS's policies and procedures manual or any written information concerning the proper evaluation of inmates in segregation.

33

(Kemp Dep. at pp. 36-38, 41, 44-46; Key Dep. at pp. 63-64).

The plaintiff also notes that although Wiley was in charge of educating, instructing and supervising the CMS nursing staff, her deposition demonstrates that she was unaware of CMS's written policies and procedures concerning the appropriate manner in which disciplinary segregation inmates were to be evaluated on a daily basis. (Wiley Dep. at pp. 31, 42-44). However, after this testimony, Wiley then states that she and her team leaders trained the staff to do what the standard requires. (Wiley Dep. at 44). With respect to Kemp's testimony that she had never heard of the subject standards and policies concerning how the people in disciplinary segregation were to be evaluated, Wiley stated that Kemp's statement would be a lie. (Wiley Dep. at p. 60).[34]

Lastly, the plaintiff asserts that Hammack, as the Medical Director, and Wiley, as the Director of Nursing, were responsible for CMS's supervision and training of the nursing staff. (Doc. 80 at p. 31 (citing Wiley Dep. at p. 44-45 and Linton Dep. at pp. 78-79)).

The Alabama Supreme Court recently stated the elements in a negligent supervision claim. The Court stated:

> The elements of negligent supervision were addressed in *Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098 (Ala. 1983), as follows:
>
>> "'In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with

---

[34] This page of Wiley's deposition is not included in the record, however, the testimony is quoted in the plaintiff's brief and defense counsel does not contest that that was her testimony. (Doc. 80 at p. 28).

> such knowledge. It is incumbent on the party charging negligence
> to show it by proper evidence.'"

425 So. 2d at 1100 (emphasis added); *see also Sanders v. Shoe Show, Inc.*, 778
So. 2d 820, 824 (Ala. Civ. App. 2000). A party alleging negligent or wanton
supervision and hiring must also prove the underlying wrongful conduct of
employees. *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999).

*Voyager Ins. Companies v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003).

Regarding the defendants' challenges, the court finds as follows. First, that, even under
the Alabama Medical Liability Act, the allegations in the complaint, as fleshed out during
discovery, are adequate to place the defendants on notice of the basis for this claim. Second, the
evidence is not sufficient to show that Hammack did not supervise the nursing staff as a matter of
law. His contract as Medical Director states that he will be available to CMS and the staff and
administration for consultation and that he will be responsible for reviewing procedures to see
that they are in compliance with APHA Standards for Health Services in Correctional Institutions
and the standards promulgated by the National Commission on Correctional Health Care. (Doc.
85, Ex. 12, pp. 2-3). Additionally, he was responsible for monthly peer review of procedures
and healthcare delivery of medical services. (*Id.* at p. 3). Third, although the evidence fails to
show that Hammack actually knew of any deficiency in the implementation of the applicable
policies and procedures, viewing the evidence in a light most favorable to the plaintiff, the
evidence would support a conclusion at this juncture that had he exercised due and proper
diligence, he easily could have learned that the procedures being implemented were not adequate.
Lastly, as noted already, the plaintiff has offered limited evidence of a causal connection between
Kemp's actions in breaching the national standards and CMS' policies and procedures
concerning daily contact and evaluation (on November 14, 1999) and Wiggins's death.

35

Accordingly, summary judgment is due to be denied on the failure to train and supervise claim.[35]

### F. Breach of Contract

The plaintiff asserts a breach of contract claim against CMS in her third amended complaint. In that claim, she asserts that Wiggins was a third party beneficiary to the written "Health Services Agreement" entered into between CMS and ADOC. The "Health Services Agreement" contractually obligated CMS to deliver reasonable and necessary health care services to DOC inmates in conformity with the contract. As part of the written agreement, CMS was obligated as follows:

- To provide reasonable and necessary health care services to inmates in accordance with the "Manual of Standards for Adult Correctional Institutions", the "Standards for Health Services in Prisons", and "Applicable State and Federal Regulations and laws.

- To provide reasonable and necessary examination of inmates on sick call, those requiring emergency medical care, and referral to medical facilities outside the correction system of those requiring specialized care.

(Doc. 80 at p. 33 (citing HSA-005, 006, ¶¶ 2.7 and 3.1)).

As already discussed, the "Standards for Health Services in Prisons" placed certain

---

[35] To the extent that the plaintiff's third amended complaint could be read to include a claim that CMS is liable under § 1983 for the failure to train and supervise, the plaintiff appears to have abandoned this claim. (See Doc. 80 at p. 27 (referring only to "Ms. Wiggins's claims regarding negligent supervision and training") and Doc. 87 at p. 5 (referring again to "Ms Wiggins's claims for negligent and wanton failure to train and supervise the nurse employees")).

Even if these claims were not abandoned, the court finds that summary judgment would be due to be granted as there has been an inadequate showing that CMS and Hammack knew of the need for further training or supervision and made a deliberate choice not to do so. *See Martin v. Anderson*, 107 F. Supp. 2d 1342, 1356 (M.D. Ala 1999) ("Inadequate police training may result in § 1983 municipal liability '"only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."' *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). 'To establish a "deliberate or conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. . . . [The Eleventh Circuit] repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.' *Gold, supra,* 151 F.3d at 1351 (citations and footnote omitted)").

requirements upon CMS to implement of policies and procedures concerning the evaluation of disciplinary segregation inmates. ("Standards for Health Services in Prisons", p. 002, ¶ P-39 ).

The defendants assert that this claim is due to be dismissed because the contract simply restates the legal duty already owed under Alabama law. (Doc. 76 at p. 35). Therefore, they assert that no relief exists under Alabama law for the plaintiff's breach of contract claim because it is based on an existing legal duty to provide adequate care. (*Id.*). The defendants assert that the plaintiff's only recovery is in tort. (*Id.*). In support of their position, the defendants cite to *Yon v. Riley*, 2002 WL 1268394 (M.D. Ala. May 29, 2002). The plaintiff retorts that the defendants' reliance on *Yon* is misplaced as Alabama law only precludes contractual claims in the medical malpractice context when the plaintiff seeks to "imply" a contractual duty. (Doc. 80 at p. 33 and Doc. 87 at p. 5). The plaintiff cites to *Marsh v. St. Margaret's Hospital*, 535 So. 2d 147, pp. 149-150 (Ala. 1988), stating that since "no express contracted existed" the hospital defendants were entitled to summary judgment on the plaintiff's contract claim." *See also Lammond v. Sewell*, 473 So. 2d 1047, 1049 (Ala. 1985) (quoting *"Green v. Hospital Building Authority of the City of Bessemer*, 318 So. 2d 701, 704 (Ala. 1975) ("the court should refrain from disturbing the well-established line of cases which have refused to imply a promise where none actually exists").

The plaintiff asserts that in the present case, the relevant written contract clearly defines the parties' duties and obligations. Nothing is "implied." According to the plaintiff, the contract is a valid, enforceable agreement between CMS and Alabama DOC to which Wiggins was a third party beneficiary. Accordingly, the plaintiff asserts that CMS should be held accountable for its failure to abide by the contractual obligations. Specifically, the plaintiff asserts that "[a]s an

37

inmate in disciplinary segregation, [Wiggins] was due to receive healthcare that was denied him

in clear breach of the express provisions of the written contract." (Doc. 80 at 34).  According to

the plaintiff, by failing to refer Wiggins to an outside facility for the specialized care he needed

on November 15, 1999, Hammack failed to implement the necessary policies and procedures

guarantee by the contract between CMS and the Alabama DOC.

In *Yon*, the plaintiff brought, among other claims, a breach of contract claim against the

defendant doctor who performed a procedure on her ear, which resulted in nerve damage. *Yon*,

2002 WL 1268394 at *1.  She also brought a contract claim against the medical center where the

procedure was performed.  In dismissing the claims, the court stated:

> The Alabama Supreme Court has held that a medical-malpractice-contract
> claim cannot be based on a legal duty.  For instance, [in] *Lemmond v. Sewell*, 473
> So. 2d 1047 (Ala. 1985), the court examined the relationship between contract and
> tort claims for medical malpractice.  In *Lemmond*, the plaintiff sought to recover
> damages for an alleged promise by physicians to render medical care.  The trial
> court granted the physician's motion to dismiss, and the Alabama Supreme Court
> affirmed.
>
> The *Lemmond* court first examined *Berry v. Druid City Hospital Board*,
> 333 So. 2d 796 (Ala. 1976).  The *Berry* case held that "the law does not imply a
> contract to exercise due care in the delivery of medical services . . . but does
> impose a duty to do so, the breach of which gives rise to a tort action."  *Lemmond*,
> 473 So. 2d 1048-49.  The *Lemmond* court endorsed this view, holding that when
> either a doctor or a hospital breaches the duty of due care in delivery of medical
> services, resulting in injury, "a tort claim, but not a contract claim, arises." *Id.* at
> 1049.
>
> In *Marsh v. St. Margaret's Hospital*, 535 So. 2d 147 (Ala. 1988), the
> Alabama Supreme Court again held that there was no breach of contract action
> against a physician and hospital for injuries allegedly resulting from treatment and
> care provided after a car accident.  The court cited *Berry* and *Lemmond*, and held
> that "we find no express contract existed" and therefore defendants were entitled
> to judgment as a matter of law. *Marsh*, 535 So. 2d at 150.
>
> Earlier, in *Bonds v. Brown*, 368 So. 2d 536 (Ala. 1979), the Alabama

Supreme Court held that the defendant hospital was not liable for injuries based on a contract theory. The plaintiff contended that the hospital had agreed to provide "safe and sufficient surroundings" and breached the contract by failing to maintain the room properly, causing the plaintiff to fall. *Bonds*, 368 So. 2d at 537. The court found plaintiff's contract claim "did no more than restate in contract terms a breach of duty imposed by law, i.e., it simply restated the negligence claim." *Id*. at 538. Although the dissent in *Bonds* argued that a contract claim could be brought based on a legal duty, when *Lemmond* was decided the *Bonds* dissenting justice recognized that this view was not the view of the court and concurred in *Lemmond's* holding. *Lemmond*, 473 So. 2d at 1049 (Beatty, J. concurring specially). It is therefore clear that, in Alabama, an implied-contract claim may not be based on a legal duty.

In general, contract claims for malpractice arise when the physician has guaranteed a certain result rather than agreed to provide a standard of case. See 61 Am. Jur. 2d Physicians, Surgeons, and Other Healers § 287 (2002) ("Absent an allegation that a defendant physician has undertaken a special contractual obligation other than to provide adequate medical service, no cause of action for breach of contract is stated."). *See also Monroe v. Long Is. Coll. Hosp.*, 84 A.D.2d 576, 443 N.Y.S. 2d 433 (N.Y.A.D. 1981) (cause of action for breach of contract will not be sustained where it is merely a redundant pleading of plaintiff's malpractice claim or an attempt to plead as a contract action one which is essentially a malpractice action). Yon makes no such allegation here.

Yon's breach-of-contract claims are based on the legal duty to provide adequate care and therefore do not state a claim upon which relief may be granted under Alabama law. . . .

*Yon*, 2002 WL 1268394 at *3-*4.

In *Yon*, there is no indication that the contract claim is premised, as it is in this case, upon a written contract. Although *Yon* is factually distinguishable, the court finds it to be persuasive. The general rule cited therein, that "contract claims for malpractice arise when the physician has guaranteed a certain result rather than agreed to provide a standard of care," is applicable in this matter. CMS agreed with ADOC to provide appropriate medical care. It did not guarantee a particular result. The reference in the agreement to outside referrals is consistent with a duty to provide adequate care and not to guarantee a result. Accordingly, the court finds that the motion

for summary judgment is due to be granted on this claim.

The court's determination of this issue is consistent with § 6-5-551 of the Alabama

Medical Liability Act which provides, in pertinent part, as follows:

> In any action for injury, damages, or wrongful death, whether in contract
> or in tort, against a health care provider for breach of the standard of care, whether
> resulting from acts or omissions in providing health care, or the hiring, training,
> supervision, retention, or termination of care givers, the Alabama Medical
> Liability Act shall govern the parameters of discovery and all aspects of the
> action. . . .

ALA. CODE § 6-5-551.[36]  CMS is a health care provider.  Although the facts before the court

would tend to support a third-party beneficiary claim for breach of contract in other situations, to

permit a separate contract action would be inconsistent with the clear language and legislative

intent of the Alabama Medical Liability Act.  The court is therefore disinclined to allow such

under the circumstances.

## V. CONCLUSION

Premised on the foregoing, the court concludes that the defendants' motion for summary

judgment (doc. 75) and supplemental motion for summary judgment (doc. 83) are due to be

denied in part and granted in part.  An order consistent with the court's findings will be entered.

The Clerk of the Court is directed to serve a copy of this order upon counsel of record.

**DONE**, this the _22nd_ day of June, 2004.

_____
**JOHN E. OTT**
United States Magistrate Judge

---

[36] This amendment became effective May 9, 2000, and "applies to all pending actions because it is remedial in nature and contains no clear language indicating that the Legislature did not intend it to have a retroactive effect." *Ex parte Coosa Valley Health Care, Inc.*, 789 So. 2d 208, 218 (Ala. 2000) (quoting *Ex parte Ridgeview Health Care Ctr., Inc.*, 786 So. 2d 1112, 1114 n.1 (Ala. 2000).